# JACKSON YATES et al.

## vs.

# GEORGE SEITZ et al.

Where, on a bill filed by a judgment creditor in behalf of himself and others who may afterwards come in, an equity of redemption is decreed to be sold, the court will apply the proceeds, after the satisfaction of the trust, to the payment of the judgments according to their priority in point of time.

In Equity. No. 1050. Decided December 4, 1869.

APPEAL from a decree affirming the report of an auditor.

THE CASE is stated in the opinion.

Messrs. S. L. PHILLIPS, W. J. MILLER and E. CARUSI for complainants.

Messrs. W. F. MATTINGLY and A. G. RIDDLE for defendants.

Mr. Justice WYLIE delivered the opinion of the Court:

This is an appeal from a decree of the special term affirming an auditor's report.

The facts of the case are as follows:

The defendant, being the owner of real estate, made several deeds of trust to secure indebtedness, and subsequently contracted other debts which the creditors put in judgments. A bill was filed by one of these creditors on behalf of himself and others who might come in praying a sale of the property. A trustee was appointed to make it, but the sum brought was insufficient, after satisfying the trusts, to pay in full all the judgment creditors who proved their claims.

The auditor reported the judgments were to be paid according to their respective priorities, thus entirely excluding many junior ones; exceptions were filed and overruled.

The correctness of this ruling is the subject for decision.

At common law execution for money was leviable only on the goods and chattels of the defendant. The feudal privileges of the lord were inconsistent with a power in the tenant of the land to alien or incumber it.

But by statute of Westminster 2d, 13 Edw. I, Ch. 18, the plaintiff was given the right either to issue a *fi. fa.* as formerly, or a new writ called *elegit.* Under this latter he could sell neither goods nor lands; but he might levy upon all the defendant's goods, except his oxen and beasts of the plow, and one-half of his lands, at a fair and reasonable extent, or valuation for their use, until the judgment should be satisfied; and this extent was to be ascertained by a jury of twelve men summoned by the sheriff.

In this way judgments first became liens on land; not that they were made so directly by Act of Parliament, but only because land might be taken in execution under the *elegit.*

This was the law in Maryland until it was superseded, in practice, by the Act of 5 George II, Chap. 7, which subjected lands to be sold under *fieri facias*, in like manner as goods and chattels; but no lands could be thus seized and sold under execution except those in which the defendant had a legal estate.

Nor was any trust estate in land liable to the *elegit* given by the statute of Westminster 2d, until after the passage of the Statute of Frauds and Perjuries, by the 10th section of which lands which were held simply in direct trust for the defendant, were made liable to be extended under that writ; and that section of the law is now in force in this District.

The trust which existed on the land of the defendant, in the present case, was not such a trust as this, but was a trust for the payment of the debt thereby secured.

During the existence of that trust, therefore, the land in question could not have been taken in execution and sold under a *fieri facias* issued by any of the judgment creditors; but in order to obtain a sale of the land, it was necessary to

apply to the chancery jurisdiction of the court, by bill, praying for a sale of the property for the satisfaction of the judgments, and of the prior deed of trust, and make the trustee who held the legal title a party defendant. That has been done, and the court decreed an absolute sale of the property, including both the legal and equitable title thereto, and the holder of the legal title, under the trust deed, was thus divested of his title, and the proceeds of the sale applied in the first place to the payment of the debt secured by the deed of trust. After the satisfaction of that debt, out of the proceeds there remains a surplus, but it is not sufficient to pay all the judgments.

The older of these judgment creditors claim to be first satisfied according to the priority of their respective judgments. This would leave nothing to be applied to the younger judgments; and these younger creditors now claim that the fund should be apportioned *pro rata,* equally, amongst all the judgments, on the ground that, as none of the judgments were a lien on the property at the time of the sale, the proceeds should be distributed like equitable assets, on the principle that equality is equity.

We think, however, that the doctrine of the distribution of equitable assets is one which has no application to the present case.

That doctrine applies only to the payment of debts due by a deceased person, and not to a fund arising from the sale under decree of court of the estate of a living person in the condition of the property which was so sold in the present instance. The word *assets* signifies goods *enough* to discharge that burden which is cast upon the executor or heir in satisfying the debts and legacies of the testator or ancestor. Tomlin's Dict.

The personal property in the hands of the executor is legal assets. So also is the real estate descended to the heir assets in his hands, as to those contracts of the ancestor by which the heir is bound. If the heir be bound by

the bond of his ancestor, the obligee may have his action against the heir, and obtain satisfaction of his judgment from the land descended to the heir, without going into a court of equity, because the heir is bound specifically by the terms of the bond. In such case the land is called legal assets, and the bond creditor may obtain payment of his debt in full, although a simple contract creditor would be cut out altogether. But if the descent to the heir be interrupted, and the testator has devised the land to the executor, or to a third person in trust to pay debts, the remedy at law of the obligee against the heir is lost, and he must look for payment to the trustee, to whom the estate was devised. He cannot maintain an action at law against the trustee, upon the the testator's bond, as he might have done against the heir, had there been no will; but his only remedy is in equity against the trustee. But if he go into equity for that purpose, that court will give him no preference over the simple contract creditors, but pay all, both the simple and the bond creditors alike.

Under the old law, as observed by Lord Camden in Silk *vs.* Prime, 1 Bro. C. C., 138, "no injury was done by the court to specialty creditors; for though real estates were assets at law to pay such debts, yet they might then be defeated by the debtor's will, or the heirs alienation" (before judgment against the latter). The assets thus reached by the aid of a court of equity, are what are called equitable assets, and are always distributed equally amongst the creditors, because in such case, none of them has a priority by lien or otherwise.

In the distribution of the assets of a deceased person's estate, the object of the court is to bring all parties interested before it and to administer upon all the assets and to close it up. In the case of the distribution of a fund derived from the sale of property belonging to a living person, made under decree of court, no estate is to be settled, but only a fund to be distributed, amongst such creditors

as have already procured a lien upon the fund, and if there be a surplus it will be handed to the owner of the property sold, notwithstanding he may have numerous creditors, whose claims have not been reduced to liens.

If we were, in the present case, to be lead by the doctrine of equitable assets, we should be bound to go much further than is asked by the complainants, and direct a reference to the auditor, with instructions to publish a notice requiring all parties interested as creditors of the defendant whether by judgment or otherwise to come before him and prove their claims in the same manner as though he were deceased; and make a *pro rata* distribution amongst them all.

But in our view the judgments in the present instance are liens on the fund in controversy, according to their priority, by well settled principles, and on authority.

The fund is the result of a sale under decree of court, in a case where the holder of the legal title was a party as well also as was the holder of the equitable title. The sale gave a perfect legal and equitable title to the purchaser. The trust deed is satisfied and extinguished, and is to be put out of consideration in this case. The residue of the fund which is alone the subject of this suit, must therefore, be regarded as the proceeds of a sale of the whole, absolute and perfect title in law and equity, according to the doctrine of equitable conversion. The object of the grantor in the deed of trust was not to part with his whole interest in the property, but only of so much as would suffice to pay the debt, in case a sale should become necessary. By the sale the incumbrance was removed, and the residue is his without that incumbrance. It is, therefore, a legal estate in the property now represented by its proceeds; and these proceeds should be distributed as the proceeds of a clear, perfect estate in the property.

In Moses et al *vs.* Murgatroyd et al., 1 Johns Ch. R., 119, it was held that the administrator of a mortgagor is not entitled to the surplus moneys arising from the sale of the

mortgaged premises; but that such surplus must be considered as part of the real estate, and descend to the heirs.

And it was only carrying out this doctrine to its logical result, when the Lord Chancellor decided in Sharp *vs.* The Earl of Scarborough, 4 Ves., 538, that an equity of redemption of a mortgage in fee is not equitable assets, as against judgment creditors, because the judgment creditor has a right to redeem the mortgage. And in Lee et al. *vs.* Stone et al., 5 Gill & J., 1, it was decided by the Supreme Court of Maryland that in equity the equitable estate of a deceased debtor is bound to the same extent as a legal estate of like quality and duration would be bound at law.

The very point in dispute, also, has been decided at least twice by the Court of Appeals of Virginia.

In Haleys *vs.* Williams, 1 Leigh, 142, that Court says: "It is a settled rule in respect to the satisfaction of judgments and other liens upon an equitable fund, where neither has the legal title, that all are to be paid according to their priority in point of time, upon the maxim, *in equali jure, qui prior est in tempore, potior est in jure.*" Symmes v. Symonds, 4 Bro. P. C., 328; Brace *vs.* Duchess of Marlborough, 2 P. Wms., 495. And in this case the fund is equitable so far as the judgment creditors are concerned, the legal title being in the trustees for the security of the debt due to F. James & Co., which has a priority over the judgments.

Coutts *vs.* Walker, 2 Leigh, is the other case.

Green, J., delivering the opinion of the Court says:

"But although the equity of P. Coutts could not be taken in execution at law, it was upon the general principles of a court of equity, bound in equity, as it would have been bound at law if it had been a legal title; and the judgment creditor has a right to insist upon the execution of the trust for the satisfaction of his judgments, precisely as the debtor would have a right to have it executed for his own benefit, if there had been no judgment. Thus a judg

ment creditor has a right to redeem a mortgage, or any other encumbrance. And amongst encumbrances, where all have nothing but equities, their equities being equal, they are entitled to satisfaction according to the priority of their encumbrances in point of time, upon the maxim, *qui prior est in tempore potior est in jure.*" Churchill *vs.* Grove, Nels. Ch. R., 89; 1 Ch. Ca., 35; 2 Ch. R., 180; Mackreath *vs.* Symonds, 15 Ves., 353; Haleys *vs.* Williams, 1 Leigh, 140.

This was an interesting case, and the facts were these: Real estate was conveyed to a trustee by deed of marriage settlement, in trust out of the rents and profits to pay the wife an annuity, and, subject to the annuity in her favor, in trust for a son of the grantor. Whilst the wife is yet living, a creditor of the son recovers a judgment against him, and then files his bill in chancery to subject the son's equitable interest in the estate to the payment of the judgment.

It was held: 1. That the equitable interest of the son could not be taken in execution at law; 2. That it was, nevertheless, bound in equity by the judgment, and equity would apply it to the payment of the judgment; 3. But, inasmuch as the annuitant was yet living, and not compellable to accept a gross sum in satisfaction of her annuity, and as the trustee was to hold the property and pay the annuity out of the profits, a court of chancery ought not to direct an out-and-out sale of the debtor's equitable interest, subject to the annuity, but ought only to direct the application towards the judgment of the surplus profits, as they accrued, after paying the annuity to the wife.

*The decree made at the special term is, therefore, affirmed.*

NOTE—The following is the very learned and able report of Mr. CHRISTOPHER INGLE, the special auditor in the foregoing case. His thorough and careful consideration of the question discussed before the court renders no apology necessary for including it in these pages notwithstanding its considerable length:

7DC—2

## SPECIAL AUDITOR'S REPORT.

This is a bill of the kind commonly but inaccurately denominated a " creditor's bill," brought by the complainants, who are judgment creditors of the defendant, George Seitz, in behalf of themselves and other creditors, to subject to the payment and satisfaction of their claims certain real estate which was conveyed by the defendant in trust to secure the payment of certain preferred debts. The bill alleges that all the debts so secured have been paid off and satisfied; but the answers and other proceedings show that some of them have not been paid off in full, but only in part, though overdue before the filing of the bill; small balances being still due on two of them.

A large number of creditors, most of them by judgment, but some by simple contract, have come in by petition.

A decree was passed for the sale of the premises mentioned in the bill. A sale was made April 15, 1869 * * * and the report of the trustee appointed to make the sale has been referred to me to state the trustee's account and the distribution of the fund in his hands.

\*    \*    \*    \*    \*    \*

The fund in the hands of the trustee is not sufficient to pay the judgments in full; and touching the proper distribution of that fund a question has been raised and argued which has never yet been authoritatively determined in this jurisdiction.

That question is, Shall the judgments be paid according to their respective priorities, or shall the judgments, or the judgment and the simple contract debts, be paid pro rata, without regard to dignity or priority?

It is to be regretted that the special auditor has not had the assistance of counsel in the labor of investigation.

In the old Circuit Court the decree in Scott *vs.* Lynch, decided in 1846 (not reported), was always supposed to have settled the question by directing payment of the liens and encumbrances, according to their legal and equitable priori-

ties. In that case, however, the fund was insufficient to pay the first specific lien, and no opportunity to test the question was afforded.

For a long time the late auditor, Mr. Redin, considering the rule in Scott *vs.* Lynch to be the law of the court, invariably followed it; and for some time after the organization of this court he continued to do so; always, however, expressing strong doubts of its propriety. No exceptions have ever, in a single instance, been taken; and thus this highly-important question has yet to be passed upon by this court.

Finally, however, in the case of Moore *vs.* Kirk, No. 1563, Chancery Rules 6, the late auditor, for the purpose of bringing into review a rule which, he says, always appeared to him to be erroneous, reversed his previous rulings, and distributed the fund pro rata among the judgment creditors. This, however, if the views which will be submitted in this report are correct, was not a test case.

No exceptions were taken in Moore *vs.* Kirk, and the question remained just where it was before.

It may be added that the present auditor of the court has followed the rule of Scott *vs.* Lynch.

The late auditor seems to have assumed in all the cases, indiscriminately, that the "assets" were equitable; not drawing a distinction which will be stated presently. It is intimated by him that the decree in Scott *vs.* Lynch was in conflict with the previous case of Law *vs.* Law, 3 Cranch C. C. R., 324, decided in 1828, and therefore overruled it.

In Law *vs.* Law the question arose between judgment creditors and creditors by simple contract and specialty; and it was held that the proceeds of the sale of an equitable title to land are equitable, not legal, assets. But in that case the defendant never had the legal title, and the court merely decided that it was not like the case of a judgment creditor who has a right to redeem a mortgage, and, by so doing, acquires a legal lien, the legal estate being thereby

re-invested in the mortgagor without reconveyance. The Act of Assembly of 1794, Ch. 60, Sec. 10, authorizes the chancellor to decree a sale of an equitable interest in land upon bill filed for that purpose. The proceeds of a sale in that case are, therefore, equitable assets in the stricter sense of that term about to be indicated.

In Moore *vs.* Kirk, also, the legal title was outstanding (although that fact was not discovered until after the property had been sold under the decree, and the owner of the legal title was not made a party; and the auditor passes over the fact without remark, as if deeming it entirely immaterial to his conclusions). Consequently, even if the auditor's report had been confirmed upon exceptions, that case would not be conclusive of this.

By the construction which the courts of Maryland uniformly gave to the Statute of 5 George II, Cap. 7, making lands in the plantations and colonies liable for debts, nothing but the legal estate is liable to execution at law. The rule is the same in England. See Plunkett *vs.* Penson, 2 Atk., 292; Shirley *vs.* Watts, 3 Id., 200; Burden *vs.* Kennedy, 3 Id., 379. And the Act of Assembly just cited is founded upon that known and acknowledged rule of law. That this rule was well established is manifested by the statute of Maryland of 1810, Chap. 60, (passed since the separation of this District from that State, and consequently never in force here), which, for the first time, subjected equitable estates to legal process.*

The 10th section of the Statute of Frauds (29 Car. II, Cap. 3) makes it lawful for the sheriff "to do, make and deliver

---

*A judgment at law is not a lien upon real estate in the District of Columbia, which before the judgment was rendered had been conveyed to trustees with a power of sale to secure the payment of the debts of the grantor described in the deed of trust : Morsell *vs.* First National Bank of Washington, United States Supreme Court, 91 U. S., 357; see, also, Van Ness *vs.* Hyatt, 13 Peters, 298; Bank of Metropolis *vs.* Guttschlick, 14 Peters, 29; Smith's Lessee *vs.* McCann, 24 How., 398.

execution" of lands held in trust for the execution debtor, like as he might or ought to have done if such debtor had been seized of such lands at the time of such execution sued. That section is in force in Maryland and the District of Columbia. See Kilty's British Statutes, *in loc.* But its application must be confined to such executory processes as were known to the law at the date of the enactment (1676), viz: *levari facias, elegit,* and *extent.* It was not until after the statute of 5 Geo. II, Cap. 7 (A. D. 1732) that, in Maryland and other American provinces, the practice of selling lands under a writ of *fieri facias* began and the remedy by *elegit* was superseded. Moreover, it was held, upon construction of the Statute of Frauds, that a mere equity of redemption was not liable to execution. See cases cited in the Maryland case of Ford *vs.* Philpot, 5 H. & J., 312.

The true canon is tersely stated by the author of the Treaties of Equity, "Legal assets, although you cannot come at them without the assistance of equity, shall be applied in a course of administration. Otherwise, where you raise assets where there were none in law. Yet even there real securities shall be first satisfied, and then the debts by bond and simple contract to be paid in average, for any other method would become impracticable." 2 Fonb., 402.

In most of the cases which have a bearing upon the distinction between legal and equitable assets, the controversy has been between creditors by specialty and creditors by simple contract, claiming payment out of the estate of a decedent.

Among creditors by bond and simple contract, equitable assets, it is admitted, a court of equity will distribute *pari passu,* or equally. See Deg *vs.* Deg, 2 P. W., 412; Cox's Case, 3 Id., 341. But will it follow the same method in the Case of creditors by judgment? Admitting now, for the sake of the argument, that the fund in question is equitable assets, let us examine the authorities upon this point.

Wilding *vs.* Fielding (10 Mod., 426) has been cited by text-writers as an authority for the doctrine that equity will sometimes decree a pro rata distribution even where there are judgment creditors. That was a case where assets were created by a court of equity, where there were none at law. The executor had paid a large portion of a mortgage debt out of the personal estate, and the assets, by reason of such payment, becoming insufficient to discharge the debts by simple contract, a bill was brought by the creditors against the heir, whose inheritance had been exonerated by the executor's payment, to compel him to refund, so far as might be necessary to satisfy the creditors. One of the creditors had obtained a judgment in an action at law against the executor, and he claimed a preference in the distribution of the money to be refunded. But the money was decreed to be refunded for the equal benefit of all the creditors. The Lord Chancellor said, however, " Had the judgment creditor been in possession of his judgment at the time of the death of the testator, I would not have taken the benefit of his judgment from him, but would have decreed the refunding for his' benefit in the first place."

In the report of the same case in 2 Vern., 764, it is said : " But if there had been personal assets, as a lease for years, a bond, or an annuity, in a trustee's name, then, although a creditor could not come at it without the aid of a court of equity, yet the assets should be applied in a due course of administration."

In Sharpe *vs.* The Earl of Scarborough, 4 Ves., 538 (a leading case), it was held that an equity of redemption of a mortgage in fee is not, as against judgment creditors, equitable assets; but that they are entitled to a priority on the ground that they have a right to redeem.

Foley's Case, 2 Freem., 49, where debts by judgment, by bond and by simple contract were decreed to be paid *pari passu*, was the case of a devise of lands to be sold for the payments of debts. But in such cases the court acts upon

the presumed intention of the testator; it presumes an equitable intention and decrees a ratable distribution ; and the fact that the devisee in trust is the same person who is nominated as executor makes no difference. "But, then," said Lord Chancellor Parker, in Wilson *vs.* Fielding (already cited) "this land may be considered a gift of the testator among all his creditors; and as the testator, the donor, has not thought fit to make any distinction between his creditors, so this court, which is in the nature of a trustee for the testator, will make none neither."

To the same principle may be referred the cases of Gibson *vs.* Finley, 4 Maryland Ch. Decisions, 75, and Cross *vs.* Cohen, 3 Gill, 257, cited by the counsel for the junior judgment creditors, who seek a pro rata distribution in this case. The language of the court of equity in those cases is, that whenever a trust funds comes under its control, it will strive to do justice to all the creditors by decreeing a ratable distribution of the fund, when that can be done without violating the plain and explicit terms of the instrument creating the trust. This is the statement of a rule of equity in relation to the construction of an instrument of writing; that is all.

Upon an examination of the decisions and *dicta* where courts of equity have applied to this question their own favorite maxim of equality, it will be found to extend no further than to cases between creditors by specialty and creditors by simple contract. See Hixon *vs.* Wythan, 1 Cas. Ch., 248; 1 Freem., 301; Willes R., 521 ; 1 Jac. & Walk., 45 ; Wride *vs.* Clarke, 1 Dickens, 382; 2 Freem., 175; 8 Simons, 63.

In Day *vs.* Washburne, 24 How., 352, all the creditors were creditors by simple contract, and a ratable distribution was decreed. But Judge Nelson, in delivering the opinion of the court, says that if any of the creditors had reduced their claims to judgment, and had issued execution, they

would thereby have acquired a preference over the rest in the distribution of the assets.*

In Maryland this question appears to have been settled in the case of Birely *vs.* Staley, 5 G. & J., 432; in which it was held that where creditors' claims to relief rest upon liens to be acquired, through judgment or execution, it follows as a necessary consequence that out of the fund pursued, if land, they must be paid according to the seniority of their judgments, or if personal property according to their respective priorities acquired by the delivery of their *fi. fa's* to the sheriff. See also Reigle *vs.* Leiter, 8 Md. Rep., 405.

Birely *vs.* Staley, it is true, was a bill to set aside a voluntary conveyance; and it may be urged that its authority, so far as it declared the fund in controversy to be legal assets, ought to be confined to cases of precisely the same character. But if in the present case the equity of a judgment creditor is based upon his right to redeem an outstanding encumbrance, and thereby acquire such a remedy *in rem.* as he would have had at law if the encumbrance had never existed—if, in other words, he calls upon the court to recognize the legal fact that a judgment at law is a lien upon real estate, it is difficult to conceive how he can ask the court to stop there and not recognize the other legal fact, that judgments at law are liens upon real estate according to their priorities in time. A judgment is not a lien, *jure naturali,* or "in conscience;" it becomes such, if at all, by the sanction of positive municipal law, and in a case like this the judgment creditor who files his bill or his petition invokes the court, as between himself and the other judgment creditors, to act upon its general and fundamental maxim that "equity follows the law," and not upon its particular and exceptional one that "equality is equity."

*In this case it was also held that, although the bill was not a general creditor's bill, yet the creditor who filed it did not thereby acquire a preference over other creditors who afterwards came in by supplemental bill or petition.

Property in land, variously modified in different parts of the world, presents itself to view in the institutions of society in an extremely primitive condition. It does not, however, necessarily involve the power of sale. "We are too apt," says Campbell (System of Land Tenure, 151), "to forget that property in land, as a transferable mercantile commodity, owned and passing from hand to hand, like any chattel, is not an ancient institution, but a modern development, reached only in a few very advanced countries." "It may be said," he adds (Ibid., 171), "of all land tenures in India previous to our [English] rule, that they were practically not transferable by sale; and that only certain classes of the better-defined claims were to some extent transferable by mortgage. The seizure and sale of land for private debt was wholly and utterly unknown—such an idea had never entered into the native imagination.*

The alienation of land, whereby the fruits and services of tenures might be impaired, was abhorrent to the genius of the feudal system.†

And there was no distinction between voluntary and involuntary alienations. As for dispositions by will, they were, originally, quite unknown.

The first innovation upon the feudal notion was the Statute of Westminster the Second, 13 Edw. I, Cap. 18 (A. D. 1285), two hundred and nineteen years after the Conquest and the introduction of the feudal system into England. This statute gave the writ of *elegit,* by means of

---

* Sir John Lubbock, after citing these passages in connection with his investigation of the moral and social condition of savages, adds: "Still less does the possession of land necessarily imply the power of testamentary disposition; and we find, as a matter of fact, that the will is a legal process of very late origin." Origin of Civilization and Primitive Condition of Man, Chap. 9, "Laws," Am., 1870.

† In the language of Chancellor Kent, 3 Com., 506, "the genius of the feudal system was originally so strong in favor of restraint upon alienation, that by a general ordinance mentioned in the Book of Fiefs, the hand of him who knowingly wrote a deed of alienation was directed to be stricken off.

which a judgment creditor, instead of his *capias ad satis-faciandem* or *fieri facias,* might choose, if the goods and chattels of the defendant were insufficient, to have satisfaction out of the rents and profits of one-half the defendant's free-hold lands.* The remedy by statute merchant and statute staple, where recognizance took the place of judgment, was still more comprehensive. But note that, in all these cases, the land was not sold, but was delivered to the execution creditor. Note, also, that an estate by statute merchant, statute staple or *elegit,* although uncertain, was a chattel interest only. Co. Litt., 42, 43.

Four hundred and forty-seven years after the Statutes of Westminster the Second the Statute of George II, Cap. 7, Sec. 4 (A. D. 1732), or rather the construction that was given to it, subjected lands in his majesty's plantations and colonies in America to seizure and sale under the writ of *fieri facias.* But this enactment was designed for the benefit of British creditors. For the mother country the sanctity that enshrined the feudal idea still remained intact and uninvaded.

This statute of George II is the law under which we live.

It would be an interesting process to array the cases, and learn from an historic review of them how the terminology appropriate to the law of administration has been transfused into a subject to which it is entirely foreign; how the distinctions between the legal and equitable assets have come to be involved in the discussions as to the application of the proceeds of a judicial sale of an interest or estate in lands. But the limits of this report will not permit it.

The term "assets" as a designation of personal property or money is never proper except in two cases: First, as a

---

*Five years afterwards the statute of *quia emptores* (18 Edw. I, Cap. 1), made it lawful for every freeman to make subinfeudations of the whole of his lands and tenements, but directed that the feoffee should hold the same, not of his immediate feoffer, but of the chief lord of the fee, "by such services and customs as his feoffer held before."

description of the available effects of a decedent; and, secondly, by adoption, in the law of bankruptcy. So with the word "distribution;" it is borrowed from the law of administration.

Story, in treating of the subject of administration, as a branch of the concurrent jurisdiction of equity, in the ninth chapter of his Equity Jurisprudence, (Sec. 531) says: "In an accurate and legal sense all the personal property of the deceased which is of a saleable nature and may be converted into ready money is deemed assets. But," he adds, " the word is not confined to such property, for all other property of the deceased which is chargeable with his debts or legacies, and is applicable to that purpose, is, in a large sense, assets."

Here, however, he confounds two things which are essentially diverse and have nothing in common but an accidental identity of name. From the beginning, in the law of administration, personal property is assets, real property is not assets. The liability of "the personal property of the deceased" is a liability created by the common law. "Real assets," or "assets by descent," denotes property by reason of which the heir is chargeable with an obligation created by his ancestor; the term belongs to a different title of the law. Though, in point of fact, there are laws in existence which subject lands to the payment of debts, either by proceedings at law or by proceedings in equity, yet the obligation imposed by such laws is another thing altogether.

Again, a "creditor's bill," properly speaking, is either a bill filed for an account of a decedent's assets and a settlement of the estate, or else it is a bill filed to set aside a fraudulent conveyance. In cases like that now under consideration the only object is to remove an obstruction in the way of the legal remedy, an obstruction placed there by the act—the *fraudulent* act it may be—of the party. By what magic is it that such an act can be fraught with the power to predominate over and defeat the will of the law and take

away private rights? In this case the whole amount of money representing the outstanding legal title, which stands between the creditors and their remedy at law, is less than fifty dollars.

The mere fact that a case is cognizable by a court of equity does not make a fund under its control equitable assets. Story admits that the jurisdiction of courts of equity in the administration of assets is founded mainly upon the duty of the court to enforce the execution of trusts. Equity Jurisprudence, Sec. 532, and cases cited in note *in loc.* He claims, however, that there are other and auxiliary grounds, as account, discovery, injunction. But it will not be pretended that any of these exist in the case now under consideration.

In favor of a pro rata distribution the analogy of our testamentary statutes has been adduced.

The Act of 1785, chapter 80, section 7, directed the distribution of personal property, first among judgment creditors in full, and if the assets were insufficient, then pro rata; and if there were a surplus, it should be divided among all other creditors, without priority or preference; and if the real estate had to be resorted to, the distribution was to be the same. And the testamentary Act of 1798, chapter 101, in providing for the distribution of personal assets, directs (subchapter 8, section 17,) judgments and decrees rendered in the lifetime of the decedent to be paid in full in preference to the simple contract and specialty debts; and if the personal assets be insufficient to pay such judgments and decrees in full, it further decrees a ratable distribution among them.* Why, it is asked, should not the same equitable principle be applied to "real assets" of an equitable character?

---

* The Act of Congress of June 24, 1812, Chap. 106, Sec. 10 (2 Stat. at Large, 758), extended the Maryland rule of distribution to Alexandria County.

To this question there are two answers:

1. This is not the case of a decedent's estate.

2. Analogy is never to be resorted to except in the absence of an express rule; and certainly it would be very unsafe to allow it to preponderate in opposition to authority.

The only State in which I have been able to find even a *dictum* to countenance a pro rata distribution in a case like this is Indiana. Kimball *vs.* Whitney, 15 Ind. R., 280, was a bill brought by a simple contract creditor against the heirs of a deceased debtor. Other creditors, some by judgment and some by simple contract, came in. Under the provisions of the Revised Statutes the cause was tried by a jury. Final judgment was rendered in favor of one of the judgment creditors, and against all the rest. Upon appeal, the court, in affirming the judgment in favor of the former and remanding the cause, said, *obiter*, "But the Willises, who succeeded in obtaining judgment, cannot exhaust the property to the exclusion of those who may yet establish their claims; but the property, if insufficient to pay the whole, must be applied ratably to all the creditors establishing their claims. The court below can make such order in the premises as will secure a just distribution among the respective creditors."

To what extent this case may have been governed by statutory law does not appear. But whatever significance may be accorded to the language just quoted, the fact that the suit was against the heirs of a deceased debtor, and not against the debtor himself, seems to make it inapplicable in the present instance. The distinction had been recognized by the same court in a number of earlier cases. See Barton *vs.* Bryant, 2 Ind. R., 189; McNaughton *vs.* Lamb, Ib., 642; Butler *vs.* Jaffray, 12 Ind. R., 511.

On the other hand, the cases in opposition to a ratable distribution in a case like this are too numerous for citation.\*

The conclusions that have been reached in this case are the following:

1. That, as between creditors by judgment or decree and creditors by specialty or simple contract, creditors by judgment or decree are entitled to a preference in payment out of the proceeds of a sale of an equity of redemption after paying off the specific liens.

2. That, as among creditors by judgment or decree, the creditors are to be paid according to their respective priorities.

3. That, if there be a surplus, creditors by specialty and creditors by simple contract are to be paid, *pari passu*, without regard to dignity or priority.

In a case where the fund is, or rather resembles equitable assets in the stricter sense—that is, "where you raise assets where there were none at law," as in Law *vs.* Law, and Moore *vs.* Kirk—it might, perhaps, be plausibly argued that, although judgment creditors have a preference over those by bond or simple contract, yet, as among themselves, the judgment creditors ought to take *pari passu*—but that is not this case.

Upon the present audit the simple contract creditors (there are no specialty creditors) have not asked to be heard in relation to their right to a participation in the fund, or the nature and extent of that right. An exception, however, was taken by the defendant to so much of my former report as enumerated the simple contract claims among the

---

\* Read, however—an authority of the highest respectability, and of a neighboring State—the opinion of the Court of Appeals of Virginia in Haley *vs.* Williams, 1 Leigh, 140, and, especially, Coutts *vs.* Walker, 2 Leigh, 268, quoted by Wylie, J., in delivering the opinion of the Court in General Term confirming this report. In Virginia, lands were not subject to seizure under *fieri facias* under 5 Geo. II, Cap. 7, but the remedy continued to be by *elegit*.

debts for which a sale of the real estate ought to be decreed. But as the simple contract creditors will be excluded at all events, whatever may be the decision of the court upon the question raised by the junior judgment creditors, it has not been deemed necessary to discuss the question that might have been raised by the former, except so far as it is incidentally involved in the adjudications already cited and the reasoning upon which the foregoing conclusions are based.

With regard to the defendant's exception to the allowance of the simple contract claims, it may be remarked, in passing, that, to some extent, he is estopped by his admissions.

Among the judgments brought in are two which were rendered by justices of the peace, upon which executions were issued and returned "*nulla bona.*" Should this report be confirmed, they will not be reached; but if a pro rata distribution should be decreed, they ought, perhaps, to be included among the other judgments. By the Act of March 1, 1823, Sec. 3 (3 Stat. at Large, 743,), extending the jurisdiction of justices of the peace, it is declared that no judgment rendered by a justice of the peace shall create a lien upon real estate nor be recorded in the office of the clerk of the Circuit Court of the District of Columbia. But it appears to have been previously considered by the old Circuit Court that such judgments became liens from the time of execution levied. Under the Act of June 24, 1812, Chap. 106, Sec. 15, a writ of *fieri facias* upon a judgment of a justice of the peace, issuing out of the office of the "clerk of Washington County," (Circuit Court) might be levied upon lands. * * * In the instances under consideration no execution could be levied upon the land in question; but the issue of execution and the return of "*nulla bona*" ought to place these claims upon an equality with the other judgments—in Moore *vs.* Kirk, by the way, the complainant's cause of action was made up of a lot of little justice's judgments.

AUGUST 6, 1869.